# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### FEBRUARY TERM, 1875.

THEODORE RUNYON, ESQ., CHANCELLOR.

ABRAHAM V. VAN FLEET, ESQ., VICE-CHANCELLOR.

ASHHURST and others *vs.* FIELD'S ADMINISTRATOR and others.

Testator directed his executors to set apart and appropriate a portion of his estate, sufficient to produce certain annuities, and which was to be reserved as a fund for their payment. The residue of his estate he gave and devised to his executors in trust for the use of his children, to be equally divided between them, share and share alike; the shares of his sons to be paid to them, respectively, as they should attain twenty-one; the interest of the shares of the daughters to be paid to them yearly, during their lives, and on their death, their respective shares to be equally divided among their children. When the eldest son became of age a settlement of the estate was made, and his portion paid to him, as was also the portion of the other son, upon his coming of age. The estate consisted largely of stock which, since the payments to the sons, has paid large extra cash and scrip dividends. The sons claim to be entitled to a share of this increase of the estate. One hundred shares of this stock and $20,000 in bonds of the same company were paid by the surviving executor to one of the sons, (who held an assignment of the other's interest,) on account of the sons' shares in the increase of the reserved fund and the fund retained for the daughters. (There had been a large *devastavit* in the estate.) *Held*—

VOL. XI. A

Ashhurst *v.* Field's Administrator.

1. That the payments to the sons on attaining majority, were in full of their shares of testator's estate, except their interest in the reserved fund; and, accordingly,

2. That the bonds and stock so paid to the sons on account of their shares of the reserved fund, with all interest and dividends, must be accounted for.

3. The executors having regarded such stock as a proper investment of the estate, should have made an appropriation of it to the shares of the daughters and the reserved fund, immediately after the settlement of their account, whereby the clear balance of the estate was ascertained; and that appropriation must now be made, ratably, to the daughters' shares and the reserved fund.

4. The sons' interests in the reserved fund should be held to be security for the daughters' interest in any waste from delivering over the $20,000 of bonds.

5. The stock dividends were declared in respect to earnings, and not carried to account of accumulated profits or surplus earnings, and the daughters are entitled thereto.

6. An apportionment of trust funds among *cestuis que trust*, not actually made, but existing only in the mind of the trustee, is not binding on the *cestuis que trust*.

On exceptions by complainants, and exceptions by the defendants, John and William H. Potter, to the master's report.

*Mr. E. Spencer Miller*, of Philadelphia, for complainants.

*Mr. Cortlandt Parker*, and *Mr. George Northrop*, of Philadelphia, for John and William H. Potter.

THE CHANCELLOR.

Thomas F. Potter, late of Princeton, in this state, by his will, dated October 21st, 1851, after directing that all his just debts and funeral expenses be paid and satisfied as soon after his decease as conveniently might be, devised all his real estate in the county of Mercer, in this state, to his wife Sarah Jane, for life, with remainder in fee to his son John. He then bequeathed to his wife, in lieu of dower, a life annuity of $6000, to be paid to her by his executors, and directed them to set apart and appropriate such part of his estate as would yield that sum; which part so appropriated was to be reserved as a fund for the payment of the annuity.

He next bequeathed to his executors and the survivors and survivor of them, $50,000 in trust for the use of his son James, who, however, subsequently died in the lifetime of the testator. All the rest and residue of his estate, real and personal, wherever it might be situated, and of whatever it might consist, he gave and devised unto his executors and the survivors and survivor of them, in trust nevertheless, for the use of his children, John Potter, William Hubley Potter, Elizabeth Potter, (now Ashhurst,) Alice Potter, (now Lippincott,) and James Potter, to be equally divided between them, share and share alike ; the shares of his sons to be paid to them respectively, as they should attain the age of twenty-one years, the interest, in the meantime, or so much thereof as might be necessary for the purpose, to be applied by his executors to the education and support of his sons; but in the case of his daughters, the interest of their respective shares was to be paid to them yearly during their lives, and in case they should marry, it was not to be under the control or liable for the debts of their husbands ; and on the death of his daughters, their respective shares were to be equally divided among their children, but if either of them should die without issue, her share was to go to her surviving brothers and sister, equally to be divided between them. And he thereby gave to his executors and the survivors and survivor of them, full power and authority to sell and convey in fee simple the whole or any portion of his real estate not therein specifically devised, and also to sell and dispose of any part of his personal estate whenever in their judgment it might be advisable to do so, and the proceeds of all such sales to invest from time to time in bonds and mortgages or in productive stocks, as they might deem best for the interests of his estate. He appointed his brother, James Potter, and Robert F. Stockton and Richard S. Field, executors. He died in 1853. All of the executors proved the will, but soon after, December 2d, 1859, all of them, except Mr. Field, ceased to act, and, subsequently, their death left him sole surviving executor.

The testator's estate was very large, and consisted of a large amount of stocks of what was known in this

state as the Joint Company (the Camden and Amboy Railroad Company, the Delaware and Raritan Canal Company, and the Philadelphia and Trenton Railroad Company), a large amount of canal and railroad bonds and other stocks of various kinds, bonds and mortgages and notes, and a plantation in Georgia.

On the 21st of January, 1858, his oldest son became of age, and the executors then paid him $127,250, which he received in stocks of the Joint Company, bonds of the Camden and Amboy Railroad Company, bonds of the Delaware and Raritan Canal Company, bonds of the Belvidere Delaware Railroad Company, bonds of the city of Cincinnati and shares of other stock, and bonds and mortgages and a note. On the 2d of December, 1859, William H. Potter became of age, and they paid him $127,345, in like securities. Although there seems to have been no actual allotment for the production of the annuity to the widow, yet it is apparent that the executors considered that they held about $132,000 of the principal of the estate, for that object and the payment of certain charges against the estate and the expenses of the trust. This is called the reserved fund. Nor was any allotment made to either of the daughters, but after the payments to the sons the rest of the estate was held by the executors or the surviving executor in one fund, with no designation of separate interests therein. After the payments had been made to John and William, there remained in the hands of the executors a large number of shares of the stock of the Joint Company. They appreciated in value greatly, and produced large cash and scrip dividends. Some of them were converted by Mr. Field, the surviving executor, into government bonds to the amount of $150,000; three hundred and sixty-four shares are held by the receiver appointed in this cause, and one hundred shares were delivered to William H. Potter, March 10th, 1870, as an additional payment on account of the shares of John and William (the latter held an assignment of his brother's share of the estate) in the increase of the reserved fund; so that, as reported by the master, the total increase on this investment

was at least $130,000 in currency, besides cash dividends and interest. Besides the one hundred shares of stock paid to William, as above mentioned, Mr. Field paid to him on the 1st of April, 1867, for himself and as assignee of his brother, $20,000 in bonds of the Camden and Amboy Railroad Company, on the same account, the shares of John and William in the increase of the reserved fund. Another railroad stock, that of the Burlington and Mount Holly Railroad Company, belonging to the fund and held by Mr. Field, also appreciated by stock or scrip dividends. Mr. Field wasted a considerable portion of the estate, but before his death he delivered over certain bonds and stocks, and after his decease his heirs-at-law paid over to the receiver $40,000, the proceeds of the sale of Mr. Field's real estate, towards indemnifying the trust estate for the waste.

The bill in this cause was filed by Mrs. Ashhurst and Mrs. Lippincott and their husbands, and Mrs. Sarah Jane Potter and the children of Mrs. Ashhurst, against the administrator of Mr. Field, and John Potter and William H. Potter. It prays an account of the residuary estate of Thomas F. Potter, deceased, from the administrator, and of the administration thereof by Mr. Field, and that the administrator may be compelled to make good any part of the principal or interest of the estate of Thomas F. Potter, which may be found to have been lost, wasted or misapplied, and for the appointment of a new trustee; and that the administrator may be compelled to pay, transfer, assign and deliver to the new trustee all money, securities or assets of the trust, and that a receiver may be appointed to take charge of the estate until a new trustee be appointed.

By an order made in this cause, it was referred to Barker Gummere, esquire, one of the masters of this court, to ascertain and take an account of the funds and securities of the trust fund or estate of the testator, and how the same were invested and held by Mr. Field, and for whose use, and whether for the separate use of any and of which of the parties, and what are the respective rights of the parties in

the fund, and how much is due from the estate of Mr. Field to the trust. The cause comes before me now on exceptions filed by the complainants, and exceptions filed by John and William H. Potter, to the report. The main question raised by these exceptions is, whether the payments made to John and William, on their arriving at their majority, were in full of their respective shares of the estate of the testator, except so far as regarded the reserved fund. The testator gave and devised all the residue of his estate in trust for the use of his children, to be equally divided between them; the shares of his sons to be paid to them, respectively, as they should attain the age of twenty-one, the interest of their respective shares in the meantime to be applied to their support and education. The shares of his daughters were not to be paid to them, but the interest thereof only, for life. As the sons respectfully became of age, they received their shares of the estate as it then stood (and it was then intact), over and above the reserved fund above mentioned. It appears that on the 1st of November, 1857, John having arrived at the age of twenty-one, a settlement of the estate was made, and the bálance remaining in the hands of the executors was found to be $640,590 00

There were afterwards received by John, on the
    21st of January, 1858,     127,250 00

    $513,340 00

There were afterwards received by William, on
    the 2d of December, 1859, when he became
    of age,     127,345 00

    $385,995 00

The reserved fund was     131,495 00

Leaving a balance of     $254,500 00

Or $127,250 for each of the daughters. These payments to the sons were made by assignments of securities of the estate to them. They appear to have taken some of them at some-

what more than their fair market value, and there is some evidence of a selection by the executors of the securities for such payments with a view to an equitable appropriation between the sons and daughters. In my judgment, these payments were in full of the shares of the sons in the estate of the testator, except their interest in the reserved fund. The will directs that the residue of the estate be equally divided between the sons and daughters, the shares of the sons to be paid them on their attaining their majority. The sons were therefore entitled, on arriving at the age of twenty-one, to their respective shares of the residue, which was to be *paid* to them, and they were entitled to their shares according to a division to be made as of the time when the residue should have been ascertained and declared. On receiving their shares, they had no longer any interest in the residue or in the investments in which it was placed, except so much as was retained for the reserved fund. Having received their shares, they were neither subject to contribution to supply subsequent waste of the shares of their sisters or of the reserved fund, nor entitled to any advantage except such as they might derive under the clause of accruer from the increase of the shares of their sisters. In accepting at par in part payment of their shares, stock which at the time was selling at ninety per cent. of its par value, they acted voluntarily, and in effect purchased it as any stranger might have done. They were under no obligation to buy it at that rate, or at any rate. They were entitled to their money. The daughters insist that it was the duty of the executors, on making the last of those payments, at the latest, to have made an appropriation to them of the investments in which their shares were then placed, and that that appropriation should have included all the stock of the Joint Company. For the reserved fund to pay the annuity to the widow, they claim that the executors should have appropriated bonds and mortgages, in view of the fact that the testator directed that a fund be set apart to produce that annuity. But the executors do not appear to have actually made any appropriation,

either to the daughters or for the widow. It is to be borne in mind that, though perhaps a promising stock, and suffering only a temporary depression, the stock of the Joint Company stood at only ninety. While such stock would not be regarded as proper for the widow's fund, it was no more so for the funds of the infant daughters, dependent for their support on the income of their shares of the estate. This court would no more have sanctioned the appropriation of such securities in the latter case than in the former. The stock in question has proved a good investment. As between the beneficiaries, the court must make an equitable appropriation. All these funds are largely wasted. The accountant finds a deficiency of $185,675.12, exclusive of interest. These stocks having proved to be the best and most productive of the investments, and there having been no appropriation, and the assignments to the sons having been, in fact, payments, it is equitable that the three funds, those of the daughters and the reserved fund, should participate, ratably, in them. The executors regarded the estate as being properly invested; it was therefore their duty to make an appropriation for the shares of the daughters and the reserved fund, immediately after the settlement of their account, whereby the clear balance of the estate was ascertained. *Carey* v. *Askew*, 2 *Bro. C. C.* 58; *Byrchall* v. *Bradford*, 6 *Madd.* 235. If they regarded it as legitimate for them to retain existing investments, whether made by the testator himself or by them, they should have made the appropriation in those investments; and if they had regarded it as their duty to change them for others involving less risks of loss or depreciation, they should have made the change without unnecessary delay, and then have made the appropriation of the substituted securities. They retained the investments in which the estate was when the account was settled, and made no change until some time afterwards. The propriety of their action in making or continuing those investments is not involved in the present consideration. No remedy is sought against them as for breach of their trust, but the

question is simply between their *cestuis que trust*, as to the rights of the latter *inter sese.* The surviving executor recognized it to be his duty to make the appropriations to the daughters, and claimed to have made them at the periods when the daughters respectively became of age, which, in the case of Mrs. Ashhurst, was October 27th, 1865, and in the case of Mrs. Lippincott, April 22d, 1867, but he was erroneously of opinion that he could not properly do so before these periods. In his letter of March 17th, 1870, to Mr. Ashhurst, he says: "Upon the settlement of the accounts of the executors, it appeared that the whole estate remaining in their hands amounted, in round numbers, to $640,000. John had then arrived at the age of twenty-one, and by the terms of the will, was entitled to receive one-fourth of the whole estate, after reserving a fund sufficient for the payment of Mrs. Potter's annuity, Mrs. Jenkins' annuity, and other charges against the estate. There was accordingly paid to him on the 21st of January, 1858, the sum of $127,000, that is, securities to that amount were assigned to him, a list of which I showed you when you were here. Of course no further account of that portion of the estate was necessary. Then, too, when William arrived at age, December 2d, 1859, the like sum of $127,000 was paid to him. The securities I also showed you. The interest upon this sum from 1857 to 1859 was paid to William, or for him, and I accounted to him for it in our settlement of December 2d, 1859. That portion of the estate, then, was thus disposed of, and no further account of it was necessary. There was then left in the hands of the executors the sum of $386,000. This could not then be distributed, for Elizabeth and Alice could not have their share of the estate set apart to them until they arrived at the age of twenty-one, and even then it was to remain in the hands of the executors, and the interest only was to be paid to them." He further says, that as to any interest or accumulations on the shares of the daughters, it went to the reserved fund, and adds: "Now as to this reserved fund, I have said it was barely sufficient to meet the

charges upon it. It was not expected that it would accumulate; but it did accumulate, owing to extra dividends on Camden and Amboy stock, and to my having sold one thousand shares of this stock and converted the proceeds into United States five-twenty bonds. In consequence of this accumulation, I made, on the 1st of April, 1867, a distribution of $40,000, that is, to John and William, $10,000 each, and a like amount added to the shares of Elizabeth and Alice, making these each $137,000. Since then I have paid to Elizabeth and Alice $8000 a year, and as they arrived at age, set apart to each of them, securities amounting to $137,000. I enclose a list of securities set apart for Elizabeth." According to the statement referred to, he set apart for Mrs. Ashhurst, on the 27th of October, 1865, United States five-twenty bonds to the amount of $50,000, Camden and Amboy consolidated bonds to the amount of $40,000, Belvidere Railroad bonds to the amount of $5000, Cincinnati six per cent. bonds to the amount of $4000, and bonds and mortgages to the amount of $38,000; in all, $137,000. But notwithstanding the statements of this letter, it does not appear that the appropriation there alleged to have been made to the daughters was ever, in fact, made. The court will, however, deal with the matter as though the separation and appropriation of securities, which ought to have been made, had been made. If the investments be conceded to have been irregular, and such as this court would not have sanctioned, that fact will in no wise prevent such equitable appropriation. Such appropriation would have given to the daughters their just proportion of the most productive securities. That proportion is correctly stated by the master; to each of them thirty-two and one-half per cent., and thirty-five per cent. to the reserved fund. The effect of that would have been to have given to the shares of the daughters and to the reserved fund, respectively, as income, the scrip dividends declared out of the earnings of the companies on the stock which would have been thus allotted.

The sons insist that the daughters are not in any event entitled to more than the interest of their shares; and that they are therefore not entitled to these stock dividends. The will, it is true, gives to the daughters the "interest" of their shares of the estate. At the same time, it authorizes the investment of these shares in "bonds and mortgages or productive stocks." I have no doubt that the testator intended to give his daughters the income of the investments in which their shares should be placed.

This subject, and the question now raised, were considered in *Van Doren* v. *Olden*, 4 C. E. *Green* 176, and it was there held, that where trust funds, of which the interest, income, or profits are given to one person for life, and the principal bequeathed over upon the death of the life tenant, are invested, either by the trustees or at the death of the testator, in stock or shares of an incorporated company, the value of which consists, in part, of an accumulated surplus or undivided earnings laid up by the company, such additional value is part of the capital; that this, as well as the par value of the shares, must be kept by the trustees intact, for the benefit of the remainderman; but the earnings on such capital, as well as upon the par value of the shares, belong to the life tenant. And when an extra dividend is declared out of the earnings or profits of the company, such extra dividends belong to the life tenant, unless part of it was earnings carried to account of accumulated profits or surplus earnings at the death of the testator, or at the time of the investment, if made since his death, in which case so much must be considered as part of the capital. In the absence of any evidence or claim to the contrary, I shall regard the stock dividends in question as having been declared in respect to the earnings of the company, not carried to the account of accumulated profits or surplus earnings at the death of the testator, as to any stock held by him then, or at the time of the investment, as to any stock bought by the executors since that time.

After the payments to the sons, the executors held nothing in trust for them, except their interest in the reserved fund.

To hold that they held all the securities which remained after such payments to the sons, in trust, to collect from them the annual interest due to the daughters on an amount, to each, equal to the sums paid to each of the sons for his share; to raise an amount of principal equal to those sums; to pay the annuity to the widow, and the expenses of the trust, and charges against the estate, and then for the sons and daughters in equal shares as to the residue, would be to give to the sons all the benefits which might arise from appreciation of the investments so far as the shares of the daughters were concerned, without any liability to contribution in case of depreciation of those investments to the loss of the daughters. The proposition needs only to be stated, to disclose its injustice.

The securities in which the sums due the daughters for their shares were invested, were held by the executors in trust for the daughters as life tenants, with remainder according to the will, and as any losses which might have been incurred from the depreciation of those securities would have fallen on those beneficiaries, if they were, as the sequel has proved they were, without remedy against the surviving executor, because of his insolvency, so they are entitled to the benefit of the gains arising from the appreciation of those securities, or from the change of the investments of their shares.

William, who received from the surviving executor $20,000 in bonds in 1867, and one hundred shares of stock in 1870, as amounts to which he was entitled in respect to his own share under the will and that of John, which had been assigned to him by the latter in the reserved fund, should be required to replace those bonds and that stock, (or account for the value thereof,) and account for all interest and dividends thereon received by him, or accrued or earned and declared since the transfer of those bonds and that stock to him. The master finds that there had been a *devastavit* committed when the $20,000 in bonds were delivered to William, and he reports that the delivery of those bonds was a payment out of the principal of the reserved fund, and that the one hundred shares of stock belonged to the daughters, having

been acquired by the expenditure of income to which they were entitled. The accountant finds, as before remarked, that in 1870, there was a *devastavit* of $185,675.12, exclusive of interest. The master reports that there are provable against Mr. Field's estate, the following sums: to Mrs. Ashhurst, for principal, $24,038.90, for income, $53,182.10; to Mrs. Lippincott, for principal, $24,038.90, for income, $53,558.09; and to the reserved fund, for principal, $22,080.90, and for income, $50,297.95. That there was a *devastavit*, there can be no question. Mr. Field stated to Mr. Keasbey, in the spring of 1870, that he had "mismanaged the estate, and desired that everything in his possession should be used to make it good." When the *devastavit* first began does not appear, and, probably, cannot be ascertained. It appears, however, from the written statement given by Mr. Field to Mrs. Lippincott, in April, 1867, that the $20,000 were paid, and the one hundred shares of stock delivered, on the theory that all the income of the estate, over and above the interest of an amount for each daughter equal to the amount paid to each son, and the annuity to the widow, the annual charges and the expenses of the trust, was the property of, and divisible among all the children. This was an error. It was only the reserved fund in which the sons still retained an interest. All the income of the rest of the estate belonged to the daughters. I cannot tell, from the evidence before me, what is the present condition of the trust estate. The value of the securities delivered over by Mr. Field does not appear. Some of them are of very large amount, nominally, but what their actual value is, cannot be determined from the evidence in the cause. But it seems, by the report of the master, that of the identifiable securities in the receiver's hands, there should be set apart, as principal, to the reserved fund, $67,325.50, and of unidentifiable securities, which should, in like manner, be assigned to it, $68,568.50, and of securities in the receiver's hands, which can be identified as part of the dividends and income from the share of the fund since December 2d, 1859, $15,046.76, at the par value thereof. These securities, in

all, $150,940.76, are subject to a deduction for depreciation in value, of $7367.85, leaving the amount of that fund, at this time, exclusive of the dividend to be received from the estate of the surviving executor, $143,562.91 ; a sum sufficient to produce over $10,000 per annum. If this fund be reduced, according to the recommendation of the master, to $107,500, there will be a sum exceeding $36,000 to be divided among the sons and daughters. But to this should be added the $20,000 paid to William in 1867, with the interest thereon; and the sum which will thus appear, should be equally divided between the sons and the daughters.

It was urged on the argument, that the sons were entitled to the $20,000 and the one hundred shares of stock just referred to, especially since it does not appear but that the condition of the reserved fund justified the payment and delivery thereof to them ; and that, if the corresponding money, which the surviving executor stated that he had set apart to the daughters at the same time, had been wasted by him, the loss must be borne by the daughters. But there is no evidence that any apportionment was made to the daughters. An apportionment existing merely in the mind of the trustee, is not binding on the *cestui que trust*. *Miller* v. *Congdon*, 14 *Gray* 114. My conclusion is, that no apportionment was made at all.

The reserved fund would not be held to stand as an indemnity to the daughters for any waste, except such as might appear to have been committed in respect to that fund in delivering the $20,000 of bonds to William. For their interest in that waste, the interests owned by William in the fund should be held to be security.

The securities contributed by the surviving executor himself in his lifetime, and the money contributed by his heirs after his death, are not, it is said, sufficient to answer the deficiency in that fund and in the shares of the daughters. Hence, in view of the limitation over of the shares of the daughters, arises a question between the sons and daughters, as to priorities of lien between wasted income and wasted

principal, on the securities and moneys contributed by Mr. Field and his heirs-at-law.

The sons insist that the daughters ought not to be allowed their claim for past interest or income on their shares received by Mr. Field, but not paid over to them, because of laches on the part of the daughters in protecting their interest in this respect, in the lifetime of Mr. Field ; and they further insist, that the daughters are, by the statements of this bill of complaint, also barred from such claim, and that, if such claim be allowed, it cannot, as before suggested, be allowed against the assets contributed by Mr. Field and his heirs-at-law, until after the deficiency of principal of the shares of the daughters shall have been supplied, if those assets be insufficient to supply the deficiency in both principal and income. They insist that the principal has a superior equity.

The daughters are not barred of their claim upon the estate of Mr. Field on the score of laches. Mrs. Ashhurst did not become of age until October 27th, 1865, and she was married to her present husband on the 23d of January, 1866 ; Mrs. Lippincott became of age on the 22d of April, 1867, and was married to her present husband on the next day. There is no ground for imputing any laches to either of them. Nor are they barred by the statements of the bill. The bill alleges that Mrs. Potter has annually received her annuity of $6000, and that the daughters have annually received sums varying in amount, but always round sums, such as $7000, or $8000, as and for their share of the income of the trust estate, without any account whatever, or statement by which it appeared why they were entitled to these particular sums, and that the endeavors of the daughters to obtain a proper and sufficient account have been unavailing. The bill prays an account, and that the administrator of Mr. Field may be decreed to make good any part of the estate, principal and interest, which, in such accounting, may be found to have been lost, wasted, or misapplied. Besides, the contributions above referred to, made to supply the deficiency in the trust estate, are to be regarded as estate of Mr. Field, and not the

trust estate. The money paid over by Mr. Field's heirs must necessarily be so regarded ; and so must the securities also. It is true, according to Mr. Field's statement, narrated by Mr. Keasbey in his letter to the complainants' counsel—(that letter is by consent made evidence in the cause)—he had obtained those securities by exchanging the securities and assets of the trust estate for them ; but it does not appear how much of the wasted interest and income is in these securities, or with what assets of the trust estate they were bought.

The equities and priorities, as to deficiencies of principal and income in the case, are equal. The daughters of the testator were, in regard to their shares, the primary objects of his bounty. His design, undoubtedly, was to secure to each of them, by the provision he made for them, the use of one-fourth of the residue of his estate from the hazards to which it would be liable if committed to their own hands ; and this purpose could be most effectually accomplished by means of the trust created by the will. Those to whom the legacies are limited over, have no equity superior to theirs.

The daughters have excepted to the master's report in other particulars than those which are above passed upon. They except, because the master has not allotted to them any part of the $20,000 and interest thereon, and the one hundred shares of stock and dividends thereon, for which he has reported that William must account. But the master has only undertaken to exhibit the claims of the daughters and the reserved fund respectively, against the assets, identifiable and unidentifiable, in hand belonging to the trusts, with the balance to be accounted for by the estate of Mr. Field. He evidently regarded it as no part of his duty, under the order of reference, to take an account with respect to either of the matters mentioned in the exception under consideration. He was right in this. The exception is not well taken. The exception based on the omission of the master to include $900 of United States bonds in his distribution or appropriation, must be sustained. The omission was undoubtedly a mere oversight. The daughters except, also, because the

master has not allotted any part of the unidentifiable assets, which, presumably, they insist, include both income and principal, to make good the deficiencies in their income. The master was right in this : he appropriates the identifiable assets to principal and income, as they respectively belong to the one or the other; those which are unidentifiable obviously admit of no discrimination.

They further except, because the master has directed an apportionment or appropriation of the unidentifiable securities between the respective funds of the daughters and the reserved fund, in the proportions of thirty-two and a-half for each of the former, to thirty-five for the latter. This direction is consistent with his views, as expressed in his report, and it is in accordance with those I have above expressed on the subject. The exception based on the allegation that the master has not, in fact, divided the three hundred and sixty-four shares of stock identifiable as derived from income, in the proportions he himself established, is well taken. The appropriation should be, according to the master's method, to each of the daughters, one hundred and eighteen and thirty one-hundreths shares, and to the reserved fund, one hundred and twenty-seven and forty one-hundredths shares. This is a mere error in calculation. The exception based on the appropriation by the master, of the identifiable income securities, is not well taken.

There appears to be no reason why the life insurance money should be appropriated to the principal of the reserved fund. If treated as an original security, or a substitution for one, it should be apportioned in the proportion of thirty-two and a-half to thirty-five. The Habersham note has been paid, and is, therefore, out of the case.

The result of my consideration of the exceptions is, that those filed on behalf of John Potter and William H. Potter, are all overruled. Of those filed on behalf of Mrs. Ashhurst and Mrs. Lippincott, the eleventh, fourteenth, and sixteenth, are allowed, and all the rest are overruled. No costs will be allowed to either side.